UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————————————————————————X

THE TILE SETTERS AND TILE FINISHERS
UNION OF NEW YORK AND NEW JERSEY,
LOCAL UNION NO. 7 OF THE
INTERNATIONAL UNION OF BRICKLAYERS
AND ALLIED CRAFTWORKERS,

                Petitioner,

-against-                              MEMORANDUM & ORDER
                                               06-CV-00784 (NGG) (RER)

SPRING STREET DEVELOPMENT
URBAN RENEWAL, LLC,

                Respondent.
—————————————————————————X

GARAUFIS, United States District Judge:

       In this civil action, Petitioner The Tile Setters and Tile Finishers Union of New York and New Jersey, Local Union No. 7 of the International Union of Bricklayers and Allied Craftworkers ("Local 7" or "Petitioner") brings one cause of action asking this court to compel Respondent Spring Street Development Urban Renewal, LLC ("Spring Street" or "Respondent") to arbitrate a contractual dispute between the parties. Local 7 moves for summary judgment on its one cause of action, contending that there is no material question of fact as to whether the parties are contractually obligated to arbitrate the dispute. Spring Street cross-moves for summary judgment on the same claim, asserting that Local 7's petition to compel arbitration should be denied. For the reasons described below, Local 7's motion is granted and Spring Street's motion is denied.

## I. Factual Background

Before setting forth the relevant facts, I note that when deciding a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). Even in a fact-intensive case, however, the court will not accept as fact mere allegations lacking evidentiary support. Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

### **The Project Labor Agreement**

Spring Street is redeveloping a mixed use construction project located at One Spring Street, New Brunswick, New Jersey. (Petitioner's Statement Pursuant to Local Civil Rule 56.1 in Support of Its Motion for Summary Judgment ("Pet. Rule 56.1 St.") at ¶ 3.) The project includes both residential condominium and commercial space. (Id.) On May 5, 2003, Spring Street and the Middlesex County Building Trades Council entered into a Project Labor Agreement Covering Construction of Spring Street Mixed Use Redevelopment Project ("PLA"). (Id. at ¶ 9.) The Middlesex County Building Trades Council is a labor organization that entered into the PLA with Spring Street on behalf of its fifteen union affiliates, one of which is Local 7. (Id. at ¶¶ 5, 10; Respondent's Rule 56.1 Statement ("Resp. Rule 56.1 St.") at ¶ 2.)

Section 1 of the PLA provides a description of the work that Local 7 would perform:

> [C]onstruction work, including all commercial tenant work and all original fit-out work on condominium units performed by Owner/Developer prior to closing of title to such condominium owners in order to secure a temporary Certificate of Occupancy, excepting condominium purchaser/owner generated specialized or upgraded finish work, to be performed on the [Spring Street project].

2

(Affidavit of Edward J. Groarke ("Groarke Aff.") Exh. A (hereinafter, "PLA") at § 1.)

Section 3 of the PLA provides that Spring Street "agrees to become signatory to and to be bound by the applicable local collective bargaining agreements of the signatory unions, appended hereto as Schedule A." (See also Pet. Rule 56.1 St. at ¶ 11.) Section 3 of the PLA also provides that if Spring Street "enters into a subcontract in connection with any construction project work, the Owner/Developer shall include in any such subcontract a requirement that the subcontractor, of whatever tier, become signatory to and be bound by this Agreement and the local collective bargaining agreements of the signatory unions appended hereto as Schedule A." (See also Pet. Rule 56.1 St. at ¶ 12.) In addition, the PLA provides that "[a] union having a jurisdiction dispute with respect to project work assigned to another union will submit the dispute" to the Plan for the Settlement of Jurisdiction Disputes in the Construction Industry for expedited resolution through a streamlined arbitration process described in that Section. (PLA at page 2.[1]) Finally, the PLA provides that "[u]pon re-negotiation of the local collective bargaining agreements of the signatory unions appended hereto as Schedule A, all changes that apply to Project work on a retroactive basis and the Owner/Developer and signatory contractors shall become signatory to such agreements." (Id. at page 3.)

**The Collective Bargaining Agreement**

As provided in Section 3 of the PLA, Local 7's Collective Bargaining Agreement was attached to the PLA as exhibit A. (See Resp. Rule 56.1 St. at ¶¶ 6, 7.) Article III of the CBA

---

[1] The PLA contains two sections that are labeled as section 5. As a result, this Memorandum and Order refers to these two sections by page number as opposed to section number.

defines the craft jurisdiction of Local 7:

> Tile Setters work includes, but is not limited to, the work defined as: . . . [t]he cutting or setting of all tile where used for floors, walls, ceilings, walks . . . .[t]he application of a floor coat or coats of portland cement mortar . . . . [t]he setting of all tile bonded with portland cement mortar . . . . [t]he setting of all tile by the adhesion method with organic and/or inorganic thin-bed bonding materials[.]

(Petition Exhibit C (hereinafter, "CBA") at Art. III.[2])

Much like the PLA, Article XVII of the CBA provides that an entity employing Local 7 shall not contract work—or permit its contractors to subcontract work—to tile setters who have not entered into the CBA:

> No Employer having a contract requiring the performance in connection therewith of labor within the classification set forth in this Agreement, shall subcontract, sell, sublet and/or assign to any other person, firm, corporation or entity who is not signatory or bound by this Agreement, the performance of such contracts including the portland cement float coat or any other portion of the contract so far as the labor is required to be performed thereunder.

(CBA at Art. XVII.)

Article XX of the CBA contains an arbitration clause that is broader than that provided in

---

[2] Although both parties cite to numerous CBA articles, only one portion of Article XX of the CBA was attached to any of the affidavits submitted by the parties. (See 6/19/06 Declaration of Alan I. Model Exhibit C.) Rule 56(e) of the Federal Rules of Civil Procedure requires that the facts upon which a motion for summary judgment motion are based be submitted to the court in the form of an affidavit made on personal knowledge. As (1) a complete copy of the CBA was attached to the Petition, (2) both parties cited to the CBA, and (3) no party objected to the opposing party's citation to the CBA, I will excuse the failure to comply with Rule 56(e). Further, I conclude that, by failing to raise the issue, each party has waived any objection to its adversary's failure to comply with Rule 56(e). Although I am excusing this non-compliance in this one case, the parties and counsel are strongly cautioned that subsequent failures to comply with Rule 56(e) will not be excused. The Court may summarily deny any subsequent motions made by the parties or counsel that fail to comply with Rule 56(e).

4

the PLA:

> With the express exception of fringe benefit contribution and payroll audit obligations, in the event a dispute arises in connection with the meaning, interpretation, or application of this Agreement, including but not limited to disputes regarding work rules, overtime, etc., such dispute shall be submitted for final and binding determination to the Joint Arbitration Board.

(Id. at Art. XX.) Article XX then describes the composition and authority of the Joint Arbitration Board.

### Spring Street Retains PMT Contracting Company

At some point in time, Spring Street retained PMT Contracting Co., Inc. ("PMT") to perform tile subcontracting at the project without requiring PMT to sign Local 7's Collective Bargaining Agreement ("CBA"). (Pet. Rule 56.1 St. at ¶¶ 4, 13, 15.) PMT has done work and continues to do tile subcontracting work on residential condominium units at the Spring Street project. (Id. at ¶ 14.) PMT has not signed the CBA. (Id. at ¶ 15.)

On February 23, 2006, Local 7 served a Notice of Intention to Arbitrate the dispute before the Tile Industry Joint Arbitration Board. (Pet. Rule 56.1 St. at ¶ 19.) Spring Street maintains that the parties never agreed to arbitrate the instant dispute and has indicated it will not participate in a proceeding before the Tile Industry Joint Arbitration Board absent a judicial mandate. (Groarke Aff. at ¶ 7; Resp. Rule 56.1 St. at ¶ 9.)

## II. Legal Analysis

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

5

non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (citations and quotation marks omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

In three cases that have come to be known as the *Steelworkers Trilogy*[3], the Supreme Court has made clear that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

---

[3] United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of Am. v. Am. Mfg., 363 U.S. 564 (1960).

6

United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). In Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-50, this court explained the rule announced in the *Steelworkers Trilogy*:

> The Supreme Court has extracted four principles from the *Steelworkers Trilogy* that control the issue of arbitrability now before this court. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." [AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986)]. Second, "the question of arbitrability . . . is undeniably an issue for judicial determination." Id. at 649. Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." Id. at 649. And, fourth, and most important in deciding the instant motion, "where the contract contains an arbitration clause, there is a presumption of arbitrability . . . . Such a presumption is particularly applicable where the clause is [ ] broad . . . . In such cases, [i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful of evidence of a purpose to exclude the claim from arbitration can prevail."

Pathmark Stores, Inc. v. United Food and Commercial Workers Local 342-50, 204 F. Supp. 2d 500, 503 (E.D.N.Y. 2002). In fact, "[t]he presumption favoring arbitration is based on a policy recognizing arbitration as a substitute for industrial strife, and on the belief that arbitrators, more so than the courts, possess the proper experience and expertise to resolve labor disputes." United Steel Workers of Am. v. Cooper Tire & Rubber Co., 474 F.3d 271, 278 (6th Cir. 2007) (internal quotations and citations omitted).

There is a "two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." Vera v. Saks & Co., 335 F.3d 109,

117 (2d Cir. 2003) (internal quotations omitted).

On a number of occasions, the Second Circuit has confronted the issue presented in this case: When two executed documents govern the relationship between the parties and only one of the documents contains an arbitration clause providing that disputes concerning that document are arbitrable, which disputes between the parties are arbitrable? On the one hand, "where a later contract lacking an arbitration clause supplements an earlier 'umbrella' agreement containing such a clause, disputes under the later contract are arbitrable." Cornell Univ. v. UAW Local 2300, 942 F.2d 138, 140 (2d Cir. 1991) (citing Pitta v. Hotel Ass'n of New York City, Inc., 806 F.2d 419, 422-23 (2d Cir. 1986)). On the other hand, if the earlier contract and the later contract are "collateral" to one another—rather than "supplement"—then an arbitration clause in the earlier agreement providing for arbitration of disputes involving the agreement does not require the parties to arbitrate disputes concerning the latter agreement. Id. "If the letter is to be construed as a collateral instrument it may be parallel or coordinate to the Collective Bargaining Agreement, but it must be dissimilar and by definition be a contract set apart and distinct from the Agreement." Cornell, 942 F.2d at 140. See also Cooper Tire, 474 F.3d at 278 (stating that, in determining whether a side agreement that does not provide for arbitration falls within a collective bargaining agreement's arbitration clause, the Second, Fourth, and Eighth Circuits follow the "collateral" test while the Third, Sixth, Seventh, and Ninth Circuits apply the "scope" test).

In Cornell, the Second Circuit held that a collective bargaining agreement that required the arbitration of those disputes that relate to the agreement's terms did not require the arbitration of a dispute concerning the terms of a subsequent letter of understanding between management

8

and the union because (1) the letter "create[d] an entirely distinct and different obligation from the" collective bargaining agreement and (2) the substance of the letter "was not contemplated by" the collective bargaining agreement. Cornell, 942 F.2d at 140. Similarly, a dispute concerning a subsequent agreement to alter the duration of an earlier collective bargaining agreement did not arise under the bargaining agreement where the earlier agreement was silent on the subject of making amendments to the agreement. Rochdale Vill., Inc. v. Public Serv. Employees Union, Local No. 80, 605 F.2d 1290, 1297 (2d Cir. 1979). See also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 88 F. Supp. 2d 168, 174 (S.D.N.Y. 2000) (holding that dispute concerning later agreement did not fall within arbitration clause in earlier agreement where later agreement did not explicitly incorporate earlier agreement or any of its terms and earlier agreement did not require the later agreement to be made).

In contrast, in Pitta v. Hotel Ass'n of New York City, 806 F.2d 419, 422-23 (2d Cir. 1986), the Second Circuit held that a dispute concerning an employment agreement that governed the terms of an arbitrator's employment was within the scope of the underlying collective bargaining agreement. The Pitta court concluded that the employment agreement "supplement[ed]" the bargaining agreement because (1) it implemented the arbitration procedures provided in the collective bargaining agreement and (2) the duration of the employment agreement was "defined and limited by that of the [b]argaining [a]greement, further indicating their relatedness." Id. at 423. See also Vittoria Corp. v. New York Hotel & Motel Trades Council, 30 F. Supp. 2d 431, 436 (S.D.N.Y. 1998) (dispute concerning subsequent agreement falls within arbitration provision in collective bargaining agreement where subsequent agreement was incorporated into the bargaining agreement by a memorandum of understanding).

9

Similarly, disputes concerning subsequent agreements amongst shareholders fell within arbitration clauses in earlier shareholder agreements where the later agreements were "expressly contemplated and provided for" in the earlier agreement. S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 195 (2d Cir. 1984). In Mineracao, disputes concerning other later agreements were held to be within the arbitration clause of the earlier agreement when the later agreement (1) confirmed the parties intentions to abide by the earlier agreements and (2) explicitly stated that it was subject to a paragraph in one of the earlier agreements.

## III. Discussion

### A. The CBA Contains an Arbitration Clause

No party has asserted that the CBA does not contain an arbitration clause. The CBA provides that "in the event a dispute arises in connection with the meaning, interpretation, or application of this Agreement," the dispute is arbitrable unless it relates to fringe benefit contributions or payroll audit obligations. Although where to place this arbitration clause along the broad-narrow spectrum is difficult, this clause is sufficiently broad to justify a presumption that disputes concerning the CBA are arbitrable. See Worldcrisa Corp. v. Armstrong, 129 F.3d 71, 74-75 (2d Cir. 1997) (holding that clause which covers "any dispute" between the parties to the agreement "over the terms" of the agreement or "any claim of breach" "is close enough to the 'broad' end of the spectrum to justify a presumption of arbitrability"). However, as discussed below, because the instant dispute clearly falls within the CBA's arbitration clause, the outcome of the instant motions would be the same irrespective of the presumption made. See Louis Dreyfus Negoce, 88 F. Supp. 2d at 173 (finding it unnecessary to reach the question of whether the arbitration clause was broad or narrow).

10

## B. The Instant Dispute Arises Under Both the CBA and PLA

The CBA provides that "in the event a dispute arises in connection with the meaning, interpretation, or application of this Agreement," the dispute is arbitrable unless it relates to fringe benefit contributions or payroll audit obligations. CBA Article XX. The instant dispute concerns provisions of both the CBA and the PLA: whether Spring Street breached its contractual duty to Local 7 by (1) retaining PMT and or (2) failing to require PMT to become a signatory to the CBA depends upon an interpretation and application of, *inter alia*, PLA Sections 1 and 3 and CBA Articles III and XVII.

Spring Street argues that the instant dispute involves only PLA Section 1. i.e., the entire dispute depends on whether "marble and granite tile work [being performed by PMT] is expressly excluded from the scope of the PLA as 'condominium purchaser/owner generated specialized or upgraded finish work.'" (Resp. Mem. at 3 (quoting PLA § 1).) However, it is impossible to understand what work Spring Street has agreed to permit Local 7 to perform without reference to CBA Article III, which describes the type of tile setting work that Local 7 has an exclusive right to perform. In order to resolve the instant dispute, it will be necessary to read PLA Section 1 alongside CBA Article III and, as a result, Spring Street's argument that the dispute arises exclusively under the PLA fails.

Similarly, Local 7 asserts that the dispute (or at least some portion of it) arises exclusively under the CBA. (Petitioner's [ ] Memorandum of Law in Opposition to the Respondent's Cross-Motion for Summary Judgment and in Further Support of Its Motion for Summary Judgment to Compel Arbitration ("Pet. Rep.") at 10-11.) However. nothing within the four corners of the CBA even requires Spring Street to comply with the terms of the CBA. Without having agreed

11

to PLA Section 3—which requires Spring Street to enter into the CBA—the CBA imposes no legal obligations on Spring Street. As a result, whether the instant dispute falls within the CBA provision requiring the arbitration of disputes arising in connection with the meaning, interpretation or application of the CBA depends on whether the PLA "supplements" the CBA or is "collateral" to it.

### C. The Instant Dispute is Arbitrable Because the Dispute Falls within the CBA Arbitration Clause and the CBA and the PLA Supplement Each Other

For at least three reasons, the CBA and PLA fall within the cases in this Circuit in which two documents governing a relationship are found to "supplement" each other.[4] First, the PLA specifically requires Spring Street to enter into Local 7's CBA:

> The Owner/Developer agrees to become signatory to and to be bound by the applicable local collective bargaining agreements of the signatory unions, appended hereto as Schedule A. If the Owner/Developer enters into a subcontract in connection with any construction project work, the Owner/Developer shall include in any such subcontract a requirement that the subcontractor, of whatever tier, become signatory to and be bound by this Agreement and the local collective bargaining agreements of the signatory unions appended hereto as Schedule A.

(PLA § 3.) As a result of this language and the parties' decision to make the CBA a schedule attached to the PLA, the parties entered into the CBA and the PLA simultaneously. The fact that the parties entered into the PLA and CBA simultaneously and the PLA specifically required Spring Street to enter into the CBA demonstrates that the parties never intended one of these

---

[4] Neither Local 7 nor Spring Street have asserted that evidence outside the four corners of the CBA or PLA would be useful in interpreting the CBA or PLA. Nor have either of the parties requested an opportunity to put forward such extrinsic evidence. As a result, both parties have waived their right to submit extrinsic evidence.

12

agreements, standing alone, to govern the relationship between the parties. These facts demonstrate that the parties understood the PLA and CBA to supplement each other. See S.A. Mineracao Da Trindade-Samitri. 745 F.2d at 195 (disputes concerning other later agreements were held to be within the arbitration clause of the earlier agreement when the later agreement (1) confirmed the parties intentions to abide by the earlier agreements and (2) explicitly stated that it was subject to a paragraph in one of the earlier agreements).

Second, neither the terms provided in the CBA nor the terms provided in the PLA provide a comprehensive agreement that is capable of governing the developer-contractor relationship between Spring Street and Local 7; instead, the terms of each of these agreements supplement those of the other. For instance, the PLA, in and of itself, does not provide any definition of Local 7's craft jurisdiction. In this regard, the PLA merely states that it is "for construction work, including all commercial tenant work and all original fit-out work on condominium units performed by Owner/Developer prior to closing of title to such condominium owners in order to secure a temporary Certificate of Occupancy, except condominium purchaser/owner generated specialized or upgraded finish work to be performed on" the Spring Street project. (PLA at § 1.) This language is insufficient to define the roles of the parties to the PLA: despite the fact that the PLA is an agreement for the provision of services between Spring Street and multiple unions, nothing in the PLA itself provides any basis for determining which unions will do which work. Instead, one must look to each individual union's collective bargaining agreements to determine the scope of the union's role in the project. Article III Section 1 of the CBA defines Local 7's craft jurisdiction to encompass a number of activities including: "cutting or settling of all tile where used for floors walls, ceilings, walks, promenade roofs . . . .[t]he application of a float coat

13

or coats of portland cement mortar . . . . [t]he setting of all tile by the adhesion method with organic and/or inorganic thin-bed bonding materials;" and others.

Similarly, the CBA is silent as to the projects for which Local 7 will be providing tile setting services. The CBA exclusivity provision states that "[n]o Employer,[5] *having a contract requiring the performance in connection therewith of labor* within the classification set forth in this Agreement, shall subcontract, sell, sublet and/or assign to any other person, firm, corporation or entity who is not signatory or bound by this Agreement, the performance of *such contracts*[.]" (CBA Art. XVII (emphasis added).) As a result, the exclusivity provision of the CBA explicitly contemplated the existence of a separate document that set out a requirement for the performance of work.

The PLA is this separate document contemplated by the CBA and specifically defines the scope of the project for which Local 7 will be providing work: Spring Street and Local 7 "desire to enter into a Project Labor Agreement to provide for the efficient, safe and timely completion of the Spring Street Mixed Use Redevelopment Project for the properties known as Block 1.5, Lots 2, 3, 4, 5, 6, 11, 12, and 13 located at Church Street, Spring Street and Paterson, City of Brunswick, New Jersey." (PLA at page 1.) The PLA and CBA are, therefore, not separate agreements. Rather, they are documents that supplement each other to form a single contractual relationship between Spring Street and Local 7.

---

[5] The CBA defines "Employer" as follows: "The Greater New York and New Jersey Tile Contractors Association, Inc.[] and The Building Contractors Association of Atlantic County, Inc. hereinafter referred to as the [] 'Associations' or the applicable Association as the 'Employer[.]'" This court reads PLA Section 3 to supplement the definition of "Employer" in the CBA to include Spring Street. Nothing in Spring Street's papers in any way suggests that it is not an "Employer" as the term is used in the CBA.

14

The CBA and PLA fall within the line of cases in which two agreements are held to supplement each other. See, e.g., Pitta, 806 F.2d at 422-23 (a dispute concerning an employment agreement that governed the terms of an arbitrator's employment was within the scope of the underlying collective bargaining agreement because the employment agreement was "defined and limited by that of the [b]argaining [a]greement, further indicating their relatedness."); Vittorial, 30 F. Supp. 2d at 436 (dispute concerning subsequent agreement falls within arbitration provision in collective bargaining agreement where subsequent agreement was incorporated into the bargaining agreement by a memorandum of understanding). The CBA and PLA are distinguishable from the agreement in Cornell, 942 F.2d at 140—relied upon by Spring Street—because the CBA and PLA (1) clearly contemplate each other and (2) do not create different obligations between the parties so much as they create a single developer-contractor relationship between the parties.

Third, the broad language in the PLA providing that any future amendments to the CBA shall apply retroactively demonstrates that the PLA supplements the CBA. The PLA states: "Upon re-negotiation of the local collective bargaining agreements of the signatory unions appended hereto as Schedule A, all changes shall apply to Project work on a retroactive basis and the Owner/Developer and signatory contractors shall become signatory to such agreements." PLA at page 3. This language confirms that the services covered by the PLA were being provided under the terms of the CBA. Further, this language provided that Spring Street agreed to any future amendments of the CBA and agreed to apply future amendments retroactively. The fact that the terms of the parties' relationship would change if and when the CBA was amended strongly suggests that the PLA supplements the CBA.

15

Spring Street argues that there are three reasons why the PLA and CBA are collateral to each other and the instant dispute arises only under the PLA. First, Spring Street argues that, under the doctrine of *expressio unius est exclusio alterius*—to express or include one thing implies the exclusion of the other[6]—the PLA's inclusion of a provision requiring the arbitration of only one very narrow category of disputes strongly suggests that the parties did not intend for any disputes falling outside the narrow clause to be arbitrated. See Cornell, 942 F.2d at 139; Prince v. Coca Cola Bottling Co. of New York, Inc., 37 F. Supp. 2d 289, 293 (S.D.N.Y. 1999) ("It is a universal principle of interpretation that *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another)."). As I have concluded that the CBA and PLA are inherently interrelated and cannot be read separately, the doctrine simply does not apply: the PLA did not exclude a broad arbitration clause so much as it incorporated the arbitration clause contained in the CBA.

Even if *expressio unius est exclusio alterius* did apply in this case, it still would not counsel in favor of Spring Street's narrow reading of the arbitration clause. The PLA provides a very specific alternative dispute resolution clause providing that a specific individual—Arbitrator J.J. Pierson—will serve as the adjudicator when "a union ha[s] a jurisdictional dispute with respect to project work assigned to another union." (PLA at pages 2-3.) As the PLA is the only document to which the 15 unions working on the Spring Street development are parties, it makes perfect sense for the PLA to include a specific dispute resolution mechanism for those disputes which are likely to involve disputes among the 15 unions. In contrast, the CBA is the primary document that governs the relationship between Spring Street and Local 7 and is the only

---

[6] Black's Law Dictionary at 620 (8th ed. 1999).

16

document that applies to only those two parties. As a result, the CBA was the sensible document in which to place the far broader arbitration clause which reaches all disputes "in connection with the meaning, interpretation or application of" the CBA other than fringe benefit contribution and payroll audit obligations. In any event, the fact that the PLA includes a narrow dispute resolution clause geared towards inter-union disputes in no way suggests that the CBA arbitration clause should be read any more narrowly than its text dictates.

Second, Spring Street argues that the PLA applies to 15 signatory unions and Spring Street would not have allowed Local 7's Joint Arbitration Board to adjudicate disputes between Spring Street and the 14 other unions: "Taken to its illogical conclusion, if Local 7's Joint Arbitration Board is empowered by the Court to interpret the PLA, then the arbitration mechanisms in the collective bargaining agreements of the other 14 signatory local unions are also free to interpret the PLA, which would invariably result in conflicting interpretations of the same PLA language." (Respondent's Memorandum of Law in Support of Respondent's Cross-Motion for Summary Judgment in Opposition to Petitioner's Petition to Compel Arbitration ("Resp. Mem.") at 7.) This argument is, at best, disingenuous. The PLA explicitly states that "[t]he Owner/Developer agrees to become signatory to and to be bound by the applicable local collective bargaining *agreements* of the signatory unions, appended hereto as Schedule A." (PLA at § 3 (emphasis added).) The PLA requires Spring Street to enter into the collective bargaining agreements of each of the unions which is a party to the PLA. As a result, each such agreement will either include an arbitration clause or permit disputes to be heard in a judicial forum. Either way, because each union has a separate collective bargaining agreement and the PLA must be read in connection with each union's distinct bargaining agreement, there is

absolutely no basis for concern about different fora reaching different interpretations of the PLA. In other words, the meaning of "purchaser/owner generated specialized or upgraded finish work" may have a very different meaning in the context of tile setting than it does in the context of the trades of other unions which are parties to the PLA (one example may be the carpenters' union). As a result, the fact that Local 7's CBA arbitration procedures may yield one interpretation of "purchaser/owner generated specialized or upgraded finish work" in the context of tile setting and the carpenter's union's arbitration procedures may yield a different interpretation of that same phrase in the context of carpentry is to be expected and is no reason for concern.

Third, Spring Street argues that Local 7's reading of the PLA and CBA requires this court to conclude that Section 3 of the PLA trumps Section 1 of the PLA: "Local 7 makes the disingenuous argument that all tile work is within its craft jurisdiction under the Local 7 CBA which negates the express carve-out it agreed to in Section 1 of the PLA." (Respondent's Memorandum of Law in Opposition to Petitioner's Motion for Summary Judgment and in Further Support of Respondent's Cross-Motion for Summary Judgment in Opposition to Petitioner's Petition to Compel Arbitration ("Resp. Rep.") at 1, 5.) This argument clearly fails. As discussed above, nothing about this court's reading of the CBA and PLA in any way suggests that PLA Section 3 trumps PLA Section 1 or disturbs the explicit Section 1 carve-out for "condominium purchaser/owner generated specialized or upgraded finish work." This carve-out appears to relate specifically to work commissioned by the ultimate condominium owner, not the builder-developer of the entire project, though the exact interpretation of this provision is outside of the scope of this opinion.

Because the PLA and CBA "supplement" each other, the instant dispute–which involves

the interpretation and application of both the PLA and CBA--falls within the CBA's arbitration clause.

## IV. Conclusion

For the reasons described below, Petitioner's motion for summary judgment is GRANTED and Respondent's motion for summary judgment is DENIED. The Respondent is hereby ordered to submit the dispute between the parties concerning the scope of work and subcontracting issues at the Spring Street Project under both the PLA and CBA to the Tile Industry Joint Arbitration Board pursuant to the procedures contained in Article XX of the CBA. The Clerk is directed to enter a JUDGMENT for Petitioner and close this case.

SO ORDERED.

Dated: March 21, 2007
Brooklyn, N.Y.

/signed/
NICHOLAS G. GARAUFIS
United States District Judge

19